UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | |
|---|---|
| United States of America,<br>        Plaintiff,<br><br>        v.<br><br>Juan Claudio D'Luna-Mendez,<br>        Defendant. | No. SA: 22-CR-00367-OLG |

## GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION TO DISMISS INDICTMENT

NOW COMES the United States of America, by and through the undersigned Assistant United States Attorney for the Western District of Texas, and files this response to Defendant's Motion to Dismiss Indictment (ECF No. 55), filed on March 31, 2023. The motion to dismiss should be denied. In support, the United States offers the following:

### Discussion

On July 20, 2022, Defendant Juan Claudio D'Luna-Mendez and his co-defendant/father, Juan Francisco D'Luna-Bilbao, were indicted by a Grand Jury in the Western District of Texas for possessing firearms as illegal aliens in violation of Title 18 U.S.C. § 922(g)(5).   ECF No. 14.

On June 27, 2022, Homeland Security Investigations (HSI), in conjunction with the San Antonio Police Department (SAPD), responded to a failed human smuggling event. On scene, investigators discovered a tractor-trailer with sixty-four illegal aliens. Tragically, forty-eight of those illegal aliens had died on scene and five later died at local hospitals.

During the investigation, HSI discovered that the tractor trailer's license plate was registered to a residence in San Antonio. A search warrant was executed at that residence. D'Luna-Mendez, along with his father/co-defendant, D'Luna-Bilbao, resided at the residence that the tractor trailer was registered to. Upon execution of the warrant, investigators located three handguns in a bedroom belonging to D'Luna-Mendez. Those firearms included an American Tactical Imports model Omni Hybrid multicaliber rifle, a German Sports Guns model GSG-5P .22 caliber handgun, and a Smith & Wesson model M&P Shield M2.0 9mm handgun.

D'Luna-Mendez admitted to possession of the firearms and being in the United States illegally and without lawful permission. Federal immigration officials researched D'Luna-Mendez through immigration records and found he is a citizen and national of Mexico, residing illegally in the United States.

In his motion, D'Luna-Mendez asks this Court to dismiss the indictment considering the Supreme Court ruling in *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111 (2022). D'Luna-Mendez's motion should be denied for the following reasons.

I.    **This Court in *Portillo-Munoz* Held that § 922(g)(5)(A) is Constitutional Under the Second Amendment.**

In *United States v. Portillo-Munoz,* 643 F. 3d 437 (5th Cir. 2011), this Court rejected the very same constitutional challenge to § 922(g)(5)(A) that D'Luna-Mendez has raised here. The Court held that noncitizens who are unlawfully present in the United States fall outside the scope of the Second Amendment's protections. *Id*. at 440.

In *Portillo-Munoz*, the Fifth Circuit recognized that "people" referenced in the Second Amendment's text excludes noncitizens. The court of appeals explained that although neither *District of Columbia v. Heller*, 554 U.S. 570 (2008), nor *McDonald v. Chicago*, 561 U.S. 742 (2010), presented "the question of whether an alien, illegal or legal, has a right to bear arms,…the Court's language [in those decisions] does provide some guidance as to the meaning of the term 'the people' as it is used in the Second Amendment." 643 F.3d at 440 & n.1.

In particular, the Fifth Circuit noted that *Heller* addressed the interest of "*law-abiding, responsible citizens* to use arms" and explained that the Second Amendment's use of the term "the people" does not extend beyond '" members of the *political community*.'" Id. at 440 (quoting *Heller*, 554 U.S. at 580-81, 635). The Fifth Circuit explained that "[t]he Court's language in *Heller* [and *McDonald*] invalidate[d] [the defendant's] attempt to extend the protections of the Second Amendment to illegal aliens," who "are not 'law-abiding, responsible citizens' or 'members of the political community,'" or "Americans as that word is commonly understood." *Id*. at 440 & n.1.

The Fifth Circuit further highlighted the Supreme Court's decision in *United States v. Verdugo-Urquidez*, 494 U.S. 259, 265 (1990), which explained, in the context of a Fourth

Amendment challenge, that the term "the people" excludes anyone who is not "part of [our] national community or who ha[s] otherwise developed sufficient connection with this country to be considered part of that community." The Fifth Circuit noted that the Supreme Court has never "held that the Fourth Amendment extends to a native and citizen of another nation who entered and remained in the United States illegally," and that "[a]ttempts to *precisely* analogize the scope of [the Second and Fourth] amendments is," in any event, "misguided." *Portillo-Munoz*, 643 F.3d at 440-41. Finally, the Court found "persuasive" the fact that "the Constitution does not prohibit Congress from making laws that distinguish between citizens and aliens and between lawful and illegal aliens." *Id*. at 442.

Since *Portillo-Munoz*, every court of appeals to have considered a Second Amendment challenge to § 922(g)(5)(A) has rejected it, albeit on varying grounds. *See United States v. Sitladeen*, --- F.4th ----, 2023 WL 2765015 (8th Cir. 2023); *United States v. Jimenez-Shilon*, 34 F. 4th 1042, 1050 (11 Cir. 2022); *United States v. Perez*, 6 F.4th 448, 455-56 (2d Cir. 2021); *United States v. Torres*, 911 F.3d 1253, 1261-64 (9th Cir. 2019); *United States v. Meza-Rodriguez*, 798 F.3d 664, 673 (7th Cir. 2015); *United States v. Carpio-Leon*, 701 F.3d 974, 977-81 (4th Cir. 2012); *United States v. Huitron-Guizar*, 678 F.3d 1164, 1168-70 (10 Cir. 2012).

Some of these circuits affirmed § 922(g)(5)(A)'s constitutionality based on a two-step analysis in which the courts first considered whether the challenged law "burdens conduct protected by the Second Amendment," and then "determine[d] and appl[ied] the appropriate level of scrutiny," based on "how close the law comes to the core of the Second Amendment right and…the severity of the law's burden on the right." *Perez*, 6 F.4th at 451, 454 (quotation marks omitted).

By contrast, this Court and the Fourth, Fifth, Eighth, and Eleventh Circuits have held that § 922(g)(5)(A) is constitutional because noncitizens who are illegally present fall outside the scope of the "people" protected by the Second Amendment.

II.       The Supreme Court's Decision in *Bruen* Validates *Portillo-Munoz.*

In *Bruen*, the Court held that the Second Amendment protects the right of "law-abiding, responsible citizens" to "carry a handgun for self-defense outside the home." 142 S. Ct. at 2156. The Court struck down a New York law that required residents to demonstrate a "proper [] cause" to obtain a license to carry a handgun outside the home because that law "prevent[ed] law-abiding citizens with ordinary self-defense needs from exercising their right to keep and bear arms." *Id.*

In reaching this conclusion, *Bruen* rejected the "'" two-step'" Second Amendment framework adopted by most courts of appeals after *Heller* that "combine[d] history with means-end scrutiny." *Id.* at 2125; *see* p. 4, *supra* (summarizing the two-step framework). *Bruen* observed that "[s]tep one of the predominant framework is broadly consistent with *Heller*, which demands a test rooted in the Second Amendment's text, as informed by history." *Bruen*, 142 S. Ct. at 2127. But the Court "decline[d] to adopt" the second step of that framework, holding that "*Heller* and *McDonald* do not support applying means-end scrutiny in the Second Amendment context." *Id.* at 2126-27.

*Bruen* thus clarified the "standard for applying the Second Amendment." 142 S. Ct. at 2129. First, "[w]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." *Id.* at 2129-30. Second, when a regulation infringes such presumptively protected conduct, "[t]he government must…justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.* at 2130. The Court explained that the relevant "metrics" for assessing a regulation's constitutionality are "how and why the regulations burden a *law-abiding citizen's* right to armed self-defense." *Id.* at 2133 (emphasis added).

Although *Bruen* had no occasion to address the scope of the right as it pertains to a noncitizen who is unlawfully present in the United States, its analysis confirms the validity of the Fifth Circuit's holding in *Portillo-Munoz*. This Court remains bound by Fifth Circuit precedent, like *Portillo-Munoz*, absent an intervening change in the law, such as by a statutory amendment, or the Supreme Court, or [the] *en banc* [Fifth Circuit]." *In re Bonvillian Marine Serv., Inc.*, 19 F.4th

787, 792 (5th Cir. 2021). "This rule is strict and rigidly applied." *Id.* "Thus, for a Supreme Court decision to change [this] Circuit's law, it must be more than merely illuminating with respect to the case before the court and must unequivocally overrule prior precedent." *Id.* (brackets and internal quotation marks omitted).

*Bruen* did not unequivocally overrule *Portillo-Munoz*. *Portillo-Munoz* conducted the type of analysis required by *Bruen* in concluding that the Second Amendment's text, as historically understood, did not protect a noncitizen who is illegally present in the United States. The Fifth Circuit then affirmed § 922(g)(5)(A)'s constitutionality on that basis and did not further engage in the type of means-end scrutiny rejected in *Bruen*. Because the Fifth Circuit's analytical approach perfectly aligns with *Bruen's* framework, *Portillo-Munoz* remains good law.

In the only circuit-level decision to address § 922(g)(5)(A)'s constitutionality post-*Bruen*, the Eighth Circuit adopted exactly this reasoning. *Sitladeen*, 2023 WL 2765015, at *4-5. That Court held that *Bruen* did not disturb prior Eight Circuit precedent (following the Fifth Circuit's *Portillo-Munoz* decision) holding that illegal aliens are outside the Second Amendment's scope. This Court should hold the same.

The Fifth Circuit's decision in *Rahimi* does not compel a contrary conclusion. *Rahimi* held that *Bruen* "render[ed] [its] prior precedent obsolete" as to § 922(g)(8). 2023 WL 2317796, at *3. But that is because this Court's prior § 922(g)(8) precedent used the mode of analysis that *Bruen* explicitly rejected. As *Rahimi* explained, this Court first considered § 922(g)(8) in *United States v. Emerson*, 270 F.3d 203 (5th Cir. 2001), where it upheld § 922(g)(8) "presumably by applying some form of means-end scrutiny *sub silentio*." 2023 WL 2317796, at *3. This Court reaffirmed that holding in *United States v. McGinnis*, 956 F.3d 747 (5th Cir. 2020), which "expressly appl[ied] means-end scrutiny." 2023 WL 2317796, at *3. *Bruen* "expressly repudiated" the means-end scrutiny "embodied in *Emerson* and applied in *McGinnis*." *Id.* As set forth above, however, this Court's § 922(g)(5) precedent does not embody or apply means-end scrutiny, and so *Rahimi*'s reasoning does not apply to it.

III.    **Even on Fresh Scrutiny, D'Luna-Mendez's Constitutional Challenge Would Fail**.

      a.   <u>D'Luna-Mendez Is Not Among "The People" Protected By The Second Amendment's Plain Text.</u>

By its terms, the Second Amendment protects the right of "the people" to keep and bear arms. U.S. Const. amend. II. In *Heller*, the Supreme Court explained that "the term ['the people'] unambiguously refers to…members of the political community." 554 U.S. at 580. The Court has observed elsewhere that "citizenship" is required part of "membership in the political community" and that "[a]liens are by definition… outside of this community." *Cabell v. Chavez-Salido*, 454 U.S. 432, 438-40 (1982). Accordingly, after analyzing the phrase "right of the people," the Court in *Heller* determined that "the Second Amendment right is exercised individually and belongs to…*Americans*." 554 U.S. at 581 (emphasis added). The rest of the opinion likewise reflects the Court's understanding that the right to keep and bear arms does not belong to noncitizens. *See id*. at 595. ("right of citizens"); *id*. at 603 ("an individual citizen's right"); *id*. at 608 (right "enjoyed by the citizen"); *id*. at 625 ("weapons not typically possessed by law law-abiding citizens"); *id*. ("possession of firearms by law-abiding citizens"); *id*. at 635 ("law-abiding, responsible citizens").

This limited understanding of the "people" referenced in the Second Amendment finds support in the historical record. Under the English Bill of Rights, the right to keep and bear arms was not "available to the whole population" but was instead expressly limited to '"' Subjects.'" *Heller*, 554 U.S. at 593 (quoting English Bill of Rights 1689, 1 W. & M., ch. 2, § 7, in 3 Eng. Stat. at Large 441)); *see id*. ("By the time of the founding, the right to have arms had become fundamental for English *subjects*.") (emphasis added)). "[T]he right to own guns in eighteenth-century England was statutorily restricted to the landed gentry," and under "English common law[,]…'aliens [were] incapacitated to hold lands.'" *Jimenez-Shilon*, 34 F.4th at 1046 (quoting *Bayard v. Singleton*, 1 N.C. 5, 9 (1787)).

"The English view carried across the Atlantic, where it was well understood that the right to bear arms 'did not extend to all New World residents.'" *Jimenez-Shilon*, 34 F.4th at 1047 (quoting Joyce Lee Malcolm, *To Keep and Bear Arms: The Origins of an Anglo- American Right* 140

(1994)). Colonial-era statutes did not extend the right to bear arms to those who were, at the time, not considered part of the political community. Massachusetts and Virginia, for example, forbade the arming of Native Americans, and Virginia also prohibited Catholics from owning arms unless they swore "allegiance to the Hanoverian dynasty and to the Protestant succession," Robert H. Churchill, *Gun Regulation, the Police Power, and the Right to Keep Arms in Early America: The Legal Context of the Second Amendment*, 25 L. & Hist. Rev. 139, 157 (2007).

Indeed, while "[a]lien men" in colonial America "could speak, print, worship, enter into contracts, hold personal property in their own name, sue and be sued, and exercise sundry other civil rights," they "typically could not vote, hold public office, or serve on juries" and did not have "the right to bear arms" because these "were rights of members of the polity." Akhil Reed Amar, The Bill of Rights: Creation and Reconstruction 48 (1998); *see also Perez*, 6 F.4th at 462 (Menashi, J., concurring in the judgment). During the American Revolution, colonial governments disarmed those who refused to "swear an oath of allegiance to the state or the United States." Saul Cornell & Nathan DeDino, *A Well Regulated Right: The Early American Origins of Gun Control*, 73 Fordham L. Rev. 487, 506 (2004); *see id.* at 506 nn.128-29 (compiling statutes); *see also* Churchill, *supra*, 25 L. & Hist. Rev. at 159 ("[T]he new state governments . . . framed their police power to disarm around a test of allegiance."). And during the ratification debates, the New Hampshire ratification convention proposed an amendment stating that "Congress shall never disarm any *Citizen* unless such as are or have been in Actual Rebellion," while delegates urged the Massachusetts convention to propose a similar amendment guaranteeing "peaceable *citizens*" the right to keep arms. 2 Bernard Schwartz, *The Bill of Rights: A Documentary History*, at 681, 761 (1971) (emphases added); *see Heller*, 554 U.S. at 603-04 (describing ratification conventions' proposals as "Second Amendment precursors"). The Bill of Rights codified the principle that membership in the political community is a prerequisite for the right to bear arms. *See McDonald*, 561 U.S. at 769-70 ("The right of *the citizens* to keep and bear arms has justly been considered, as the palladium of the liberties of a republic; since it offers a strong moral check against the usurpation and arbitrary power of rulers; and will generally, even if these are successful in the first

instance, enable the people to resist and triumph over them." (quoting 3 J. Story, Commentaries on the Constitution of the United States § 1890, p. 746 (1833)) (emphasis added)). Indeed, "Framing-era sources 'refer to arms-bearing as a *citizen's* right' that was closely associated with national fealty and membership in the body politic." *Jimenez-Shilon*, 34 F.4th at 1048 (collecting sources and quoting Note, *The Meaning(s) of "The People" in the Constitution*, 126 Harv. L. Rev. 1078, 1093 (2013)). Accordingly, "many early state constitutions . . . expressly limited the right to keep and bear arms to 'citizens.'" *Id.* at 1049 (collecting Alabama, Connecticut, Kentucky, Maine, Mississippi, and Pennsylvania constitutions); *Perez*, 6 F.4th at 463 & n.6 (Menashi, J., concurring in the judgment) (discussing the same constitutions).

Set against this historical background, D'Luna-Mendez cannot reasonably contend that he is within the class of persons to whom the Second Amendment's protection applies. D'Luna-Mendez is a noncitizen who was present in the United States unlawfully at the time he was found in possession of several firearms. Because the Second Amendment does not reach noncitizens like D'Luna-Mendez, his challenge fails.

Again, *Rahimi* does not compel a contrary conclusion. What *Rahimi* held as to people subject to civil domestic-violence orders does not apply to illegal aliens. *Rahimi* reasoned that the Second Amendment covers those subject to civil orders because they do not constitute a "group[] whose disarmament the Founders 'presumptively' tolerated or would have tolerated." *Id.* at *4 (quoting *Heller*, 554 U.S. at 527 n.26). But the Court recognized that some people—like convicted felons and others subject to "longstanding prohibition[s] on the possession of firearms"—are outside "the political community within the amendment's scope." *Id.* at *5. Rahimi was covered by the Second Amendment's plain text for the very reason that he "was not a convicted felon or otherwise subject to" such a longstanding prohibition excluding him from the political community. *Id.* As set forth above, however, Supreme Court and Fifth Circuit precedent exclude illegal aliens from the political community. Thus, *Rahimi*'s analysis is consistent with the conclusion that illegal aliens enjoy no Second Amendment protection at *Bruen*'s first, textual inquiry.

b.   Additionally, § 922(g)(5)(A) Is Consistent With This Nation's Tradition Of Firearms Regulation

Assuming the Second Amendment's plain text applies in some measure to noncitizens like S*itladeen*, § 922(g)(5)(A) still passes constitutional muster under *Bruen*. The right to keep and bear arms is not "unlimited" and remains subject to "lawful regulatory measures" that are "fairly supported by . . . historical tradition." *Heller*, 554 U.S. at 626-27 & n.26 (quotation marks omitted). The government may justify a challenged restriction by showing "that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Bruen*, 142 S. Ct. at 2127. Courts may "determin[e] whether a historical regulation is a proper analogue for a distinctly modern firearm regulation" by assessing "whether the two regulations are 'relevantly similar.'" *Id.* at 2132. In doing so, courts should then examine "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* at 2133.

Two historical markers carry salience with respect to noncitizens who are present in the United States unlawfully. First, there is abundant precedent before, during, and after the American Revolution for disarming individuals who were not members of the political community. *See* pp. 7-9, *supra*; *see also Perez*, 6 F.4th at 462 n.4 (Menashi, J., concurring in the judgment) ("[A]rms bearing and suffrage were intimately linked two hundred years ago and have remained so." (quotation marks omitted)). Laws barring Native Americans, Catholics, and Loyalists from bearing arms demonstrate that the right to bear arms was understood to be limited to those within the political community.

Second, history shows that legislatures may disarm persons who pose a "real danger of public injury," *United States v. Skoien*, 614 F.3d 638, 640 (7th Cir. 2010) (en banc) (quotation marks omitted), or who have "disrespected the rule of law" and thereby threatened the social order, *Range v. Att'y Gen.*, 53 F.4th 262, 279 (3d Cir. 2022)[1]  (per curiam). In England, for example, officers of the Crown had the power to disarm persons who were "dangerous to the Peace of the Kingdom." *Kanter v. Barr*, 919 F.3d 437, 451 (7th Cir. 2019) (Barrett, J., dissenting) (quotation

---

[1] Although the Third Circuit has granted rehearing en banc and vacated the panel opinion in *Range,* the government cites it for its persuasive value, as courts including this one have done since it was vacated. See, e.g., *United States v. Rahimi*, 61 F.4th 443, 2023 WL 2317796, at *4-5 (5th Cir. Mar. 2, 2023).

marks omitted). And in Revolutionary America, legislatures often disarmed those who refused to

"swear[] fidelity to the revolutionary regime," "who defamed resolutions of the Continental

Congress," or "who were unwilling to abide by . . . legal norms." *Range*, 53 F.4th at 278-79.

Section 922(g)(5)(A) fits comfortably within these historical traditions. *See, e.g.*, *Meza-Rodriguez*,

798 F.3d at 673. Noncitizens without lawful status have, by definition, "already violated a law of

this country" by entering or remaining in the United States illegally. *United States v. Toner*, 728

F.2d 115, 128 (2d Cir. 1984). Further, noncitizens without lawful status may be less likely to

comply with the identification and recordkeeping requirements associated with purchasing firearms

from licensed dealers, because they often live "largely outside the formal system of registration,

employment, and identification" and can be "harder to trace and more likely to assume a false

identity." *Huitron-Guizar*, 678 F.3d at 1170. Noncitizens without lawful status also "have an

interest in eluding law enforcement," creating a risk that they could misuse firearms against

immigration authorities attempting to apprehend them. *Meza-Rodriguez*, 798 F.3d at 673; *cf.* 18

U.S.C. § 922(g)(2) (disarming fugitives). Congress could thus reasonably conclude that the

noncitizens who fall within § 922(g)(5)(A) should be disarmed.

It does not matter that the Founding-era laws are not identical to § 922(g)(5)(A). *Bruen*

recognized that courts should be mindful of changing societal conditions in evaluating how closely

a challenged regulation must conform to historical precedent. The key question under *Bruen* is

"whether modern and historical regulations impose a comparable burden on the right of armed self-

defense and whether that burden is comparably justified." 142 S. Ct. at 2133. In this regard, the

government need not identify "a dead ringer for historical precursors"; "a well-established and

representative historical analogue" will suffice. *Id.* (emphasis omitted). The historical markers

identified above—disarming individuals who lacked membership in the political community or

who were unwilling to comply with the law—plainly align with § 922(g)(5)(A)'s prohibition.

Compared to those historical regulations, § 922(g)(5)(A) imposes an identical burden on the right

to armed self-defense. That burden is also "comparably justified." *Id.* At the time of the founding,

disarmament was considered necessary to protect against the danger to the "civic community"

posed by those refusing to abide by its legal and social norms. *See Range*, 53 F.4th at 275-77. Section 922(g)(5)(A) is similarly justified by an illegally present non-citizen's lack of membership in the political community and the challenges presented by their possession of firearms.

One final consideration merits mention in this inquiry. Courts traditionally afford Congress significant deference in matters relating to citizenship and immigration. "[T]he responsibility for regulating the relationship between the United States and our alien visitors"—determinations about which noncitizens should be allowed to enter and remain in the United States and the terms and conditions imposed upon such noncitizens while they are here—is "committed to the political branches" of government. *Mathews v. Diaz*, 426 U.S. 67, 81 (1976). In exercising that power, "Congress regularly makes rules that would be unacceptable if applied to citizens." *Id.* at 80. And because Congress's "power over aliens is of a political character," its exercise of that power is "subject only to narrow judicial review." *Hampton v. Mow Sun Wong*, 426 U.S. 88, 101-02 n.21 (1976); *see Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 210 (1953) (holding that congressional power over noncitizens is "largely immune from judicial control"). Congress was entitled to determine that noncitizens who are unlawfully present in the United States, and are therefore potentially subject to removal, should not be permitted to possess firearms while they are here. That consideration further confirms what the historical record shows: § 922(g)(5)(A) reflects a lawful regulatory measure.

## IV.    Conclusion

D'Luna-Mendez is charged with knowingly possessing firearms while being here in the United States illegally. He moves to dismiss by arguing that, under the *Bruen* analysis, a § 922(g) is unconstitutional, and, therefore, a § 922(g)(5) should also be found unconstitutional. D'Luna-Mendez's motion should be denied because the conduct under § 922(g)(5) does not fall within the scope of the Second Amendment right.

Respectfully submitted,

JAIME ESPARZA
United States Attorney

/s/ *Sarah Spears*
Sarah Spears
Assistant United States Attorney

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 11, 2023, a true and correct copy of the foregoing instrument

was electronically filed with the Clerk of the Court using the CM/EF System.

/s/ *Sarah Spears*
Sarah Spears
Assistant United States Attorney